147 F.3d 71
 135 Lab.Cas. P 33,704, 4 Wage & Hour Cas.2d
(BNA) 1293
 Steven ROMAN, Plaintiff-Appellant,
v.
MAIETTA CONSTRUCTION, INC., Defendant-Appellee.
 No. 97-2103.
 United States Court of Appeals,
First Circuit.
 Heard Feb. 5, 1998.
Decided July 2, 1998.
 
 Donald F. Fontaine, with whom Lynne A. Gardner, Fontaine & Beal, P.A., Thomas H. Somers and Hoff, Curtis, Pacht, Cassidy & Frame, P.C., were on brief for appellant.
 Graydon G. Stevens, with whom Kelly, Remmel & Zimmerman, was on brief for appellee.
 Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.
 TORRUELLA, Chief Judge.
 
 
 1
 Plaintiff Steven Roman filed this action against his former employer Maietta Construction, Inc. ("Maietta") for back pay plus liquidated damages under section 16(b) of the Fair Labor Standards Act ("FLSA"). Roman also joined pendent state claims for unpaid wages and overtime pay under 26 Me.Rev.Stat. Ann. §§ 670, 626-A. While the trial court ultimately awarded plaintiff $2,436 plus costs and reasonable attorney's fees, it denied Roman's claim for compensation for time spent at the race track as a crew chief for stock cars raced by the son of Maietta's owner. The court also rejected plaintiff's claim for damages under 26 Me.Rev.Stat. Ann. § 626-A. Roman appeals these portions of the judgment. He also challenges certain factual findings as well as the trial court's calculation of damages. We affirm.
 
 I. BACKGROUND
 
 2
 The following facts are largely undisputed. We summarize disputed facts in a manner consistent with the district court's supportable findings of fact. See United States v. Gallo, 20 F.3d 7, 9 (1st Cir.1994).
 
 
 3
 Roman became interested in stock car racing in the late 1970s. Prior to 1984, he owned and raced two stock cars, serving as crew chief for these cars and paying the drivers a percentage of the winnings. During this time, he also served as crew chief for two stock cars that he did not own. He considered the members of the crews on the cars that he owned to be volunteers and did not compensate them. Moreover, he was not paid for his work as crew chief on the cars that he did not own, and in fact, considered himself a volunteer when he worked in that capacity.
 
 
 4
 Roman met Michael Maietta, Sr. ("Michael"), a son of the owner of Maietta, at the race track where both of them did most of their racing. In 1984, Roman provided building and repair services for the stock cars raced by Michael at Roman's body shop in Windham, Maine. Roman was paid for these services. At the time, Roman made his living from the body shop. In 1985, Roman began serving as crew chief for Michael's stock cars. He performed this work as a volunteer. His duties as crew chief for the stock cars included being present at weekly races from April through October every year. Races were usually held on Saturdays, although some races occurred on Sundays or on Friday or Wednesday nights. Occasionally, there were two races in a week.
 
 
 5
 Maietta advertised at the race track where Michael raced, most often as part of a package deal that it arranged with the owner of the track. Maietta provided some parts and services, but no cash, to Michael in connection with his racing, and the company's name was painted on Michael's stock cars as a sponsor. At all relevant times, the construction company did not own these stock cars.
 
 
 6
 In 1987, Roman asked Michael whether Maietta could hire him to work as a welder. Michael is not and never has been an officer, owner, or director of Maietta, although he was employed by the company in a supervisory position. Michael approached his father, Louis Maietta, Sr. ("Louis Sr."), with this request and Louis Sr. approved the hiring of Roman as a welder at $12 per hour. Roman was employed by Maietta from the fall of 1987 through June 26, 1995.
 
 
 7
 The year Roman was hired, Louis Sr. gave Michael permission to move his stock cars from Roman's Windham shop to the construction company's business premises in Scarborough, Maine, on the condition that no one work on the cars during regular business hours. However, Roman regularly worked on the stock cars during business hours. He recorded all of the time during which he worked on the stock cars at Maietta's premises on his time cards, which were processed through the company's time clock. All of the supervisors at the premises, who were sons of Louis Sr., were aware of these activities but did not direct Roman to stop. Whenever Louis Sr. learned that Roman was working on the stock cars during business hours, he would tell Roman to stop or tell one of his sons to tell Roman to stop. However, Louis Sr.'s sons continued thereafter to permit Roman to work on the stock cars while on the firm's time clock. Roman was paid by Maietta for all the hours he recorded, including the hours spent working on the stock cars.
 
 
 8
 In 1989, Roman's pay was increased to $16 per hour. He was frequently paid time and one-half by Maietta for overtime hours. Roman spent many of these hours working on Michael's stock cars. At some time during his employment, Roman and Louis Maietta, Jr. ("Louis Jr."), one of Louis Sr.'s sons and vice-president and a director of Maietta, agreed that any hours over 40 hours in a given week spent by Roman working on the stock cars at Maietta's business premises would be "held" rather than included in his paycheck for that week. Payment for these held hours was accomplished in stages by paying him on the basis of a 40-hour work week in weeks when he, in fact, worked fewer than 40 hours. Roman and Maietta, acting through Louis Jr., referred to these held hours as "compensatory time." They also agreed that Roman could take compensatory time off in exchange for held hours. Between June 9, 1993 and August 24, 1994, Maietta held a total of 120.75 hours from Roman's time cards. During this same time period, Maietta paid Roman for a total of 105 hours in compensatory time at the rate of $16 per hour.
 
 
 9
 In August 1994, Roman sustained an injury while working at Maietta. He returned to work in November 1994, but his relationship with the company and with Michael deteriorated thereafter. Roman did not serve as Michael's crew chief after the 1994 season. After Roman ceased working for the construction company on June 26, 1995, he filed this action under the FLSA for additional wages he contended were due to him. In particular, the plaintiff sought back pay for serving as Michael's crew chief during weekend races. He also joined pendant state law claims.
 
 
 10
 Both parties consented to having a magistrate conduct all proceedings in the case pursuant to 28 U.S.C. § 636(c). Following three days of hearings, the magistrate determined that, under the FLSA, the plaintiff was entitled to overtime pay for all compensatory time. The court awarded the plaintiff an additional $8 per hour for the 105 hours of compensatory time for which he had received only $16 per hour, and awarded the overtime rate of $24 per hour for the 15.75 hours of compensatory time for which he was not paid, for a total of $1,218. The trial court also ruled that, under both the FLSA and state law, Roman was entitled to liquidated damages in the amount of the unpaid overtime plus costs and attorney's fees. Thus, the magistrate rendered judgment for Roman in the amount of $2,436 plus costs and reasonable attorney's fees. However, the trial court denied back pay for Roman's services as Michael's crew chief. In addition, the trial court found that Roman was not entitled to damages in excess of those provided by the FLSA because the FLSA was the exclusive remedy for the enforcement of rights created under the act. On appeal, Roman challenges these aspects of the judgment.
 
 II. DISCUSSION
 
 11
 We review a trial court's findings of fact for clear error and its application of the law to the facts de novo. See Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir.1997).
 
 A. Factual Findings
 
 12
 Roman challenges the trial court's finding of fact that, prior to joining Michael's racing team, the plaintiff considered himself a volunteer when he served as crew chief on two stock cars he did not own. We find no clear error in the court's determination. With respect to one of the cars, Roman specifically testified, "I was a volunteer." In addition, plaintiff testified that his crew chief activities turned from sport to work when he joined Michael's crew. The court could have reasonably concluded from this testimony that Roman considered himself a volunteer on any stock car he worked on prior to Michael's stock cars. Accordingly, we see sufficient record support to affirm the trial court's finding that Roman was a volunteer on the two stock cars at issue.
 
 
 13
 Roman also disputes the trial court's factual finding that the construction company contributed no cash to Michael's racing activities, citing to various portions of the trial transcript which provide some backing for his challenge. However, other parts of the transcript, such as Michael's testimony that he received no cash from the construction company for his racing team, corroborate the trial court's finding.
 
 
 14
 Undoubtedly, Maietta provided some financial support for Michael's racing endeavors. Nevertheless, we are not convinced that the record clearly establishes that the company made cash contributions to Michael for his racing team. "A finding of fact is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made." Mitchell v. United States, 141 F.3d 8, 17 (1st Cir.1998). Lacking such a conviction, we rule that the trial court did not commit clear error in finding that Maietta did not provide funding to Michael in connection with his stock car racing.
 
 B. Roman's Crew Chief Activities
 
 15
 Roman challenges the trial court's conclusion that the weekend time he devoted to his crew chief activities for Michael's stock cars was not compensable under the FLSA. The FLSA provides in relevant part that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of [forty] hours ... at a rate no less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a). The act "defines the verb 'employ' expansively to mean 'suffer or permit to work.' " Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); see also 29 U.S.C. § 203(g). "The employer-employee relationship does not lend itself to rigid per se definitions, but depends 'upon the circumstances of the whole activity.' " Reich v. ConAgra, Inc., 987 F.2d 1357, 1361 (8th Cir.1993) (citing Marshall v. Truman Arnold Distrib. Co., Inc., 640 F.2d 906, 908 (8th Cir.1981)). Viewing Roman's activities as a whole, we agree with the trial court that the FLSA does not require Maietta to compensate Roman for his crew chief duties at the race track.
 
 
 16
 Maietta hired Roman to work as a welder on its business premises. However, the record reflects that he spent a substantial amount of his time at the job site working on Michael's stock cars. Roman contends that since he performed the same type of work on the stock cars at the race tracks, his weekend racing activities were an extension of his workweek. Thus, according to the plaintiff, he is entitled to compensation for any time spent as Michael's crew chief.
 
 
 17
 The FLSA applies to "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598, 64 S.Ct. 698, 88 L.Ed. 949 (1944). Several of Roman's supervisors did permit him to work on stock cars during business hours. Nevertheless, nothing in the record supports the claim that Maietta Construction required Roman to serve as crew chief as part of his job. Indeed, as the magistrate observed, "[t]he work performed by Roman at the race tracks was not primarily for the benefit of Maietta; ... the benefit to Maietta, if any, is too tenuous to provide the basis for any legal liability to pay wages for that work." Roman v. Maietta Constr., Inc., No. 96-256, slip op. at 5 (D.Me. Aug. 13, 1997).
 
 
 18
 While Maietta's name as well as those of other companies were painted on Michael's stock cars as sponsors, the link between any potential benefits accruing to the construction firm from Michael's performance as a stock car driver and Roman's crew chief activities is far too attenuated to trigger the FLSA. Maietta may have garnered some advertising benefits from the success of Michael's racing team, but such indirect benefits do not establish an employer-employee relationship between the construction firm and anyone who may have contributed his time to that activity.
 
 
 19
 Furthermore, the record suggests that Roman served as crew chief for his personal enjoyment rather than for the benefit of Maietta. Prior to joining Michael's racing team, Roman served as a volunteer crew chief for his own stock cars as well as for two cars he did not own. In addition, he considered himself a volunteer on Michael's crew before he started working for Maietta. From this evidence, it is reasonable to conclude that he continued to pursue his crew chief activities primarily for his personal benefit during his employment as a Maietta welder.
 
 
 20
 Roman responds that the fact he may have volunteered to be Michael's crew chief is not determinative. He argues in his brief, "[t]he crucial question is not whether the work was voluntary but rather whether the (employee) was in fact performing services for the benefit of the employer with the knowledge and approval of the employer." Secretary of Labor v. E.R. Field, Inc., 495 F.2d 749, 751 (1st Cir.1974). Roman fails to recognize that he was hired to weld and fabricate construction equipment rather than to help Michael race his stock cars. If the plaintiff had voluntarily expended extra time engaged in welding work, and Maietta knew and approved of such work, the company would have to compensate Roman for those hours. However, we have established that the connection between Roman's crew chief activities and any benefits to Maietta is too insubstantial to warrant compensation under the FLSA. Therefore, Roman cannot recover for the time he volunteered to serve as Michael's crew chief.
 
 C. State Law Penalties
 
 21
 Roman argues that the trial court erred in failing to grant him the remedies set forth in 26 Me.Rev.Stat. Ann. § 626-A for Maietta's violation of § 621 of that statute.[1] We disagree. As the trial court noted, "the FLSA is the exclusive remedy for enforcement of rights created under the FLSA." Roman, No. 96-256, slip op. at 7 (citing Tombrello v. USX Corp., 763 F.Supp. 541, 544 (N.D.Ala.1991)). That is, "the plaintiff cannot circumvent the exclusive remedy prescribed by Congress by asserting equivalent state claims in addition to the FLSA claim." Tombrello, 763 F.Supp. at 545.
 
 
 22
 Roman contends that his claim for relief under § 621(1) has no FLSA equivalent. However, our review of the complaint as well as the record shows that Roman never raised a claim under that subsection. Instead, Roman sought relief under both the FLSA and 26 Me.Rev.Stat. Ann. §§ 664 and 670 for minimum wage and overtime pay violations. Since Roman received compensation under the FLSA for his claims, he cannot recover again under Maine law.
 
 D. Compensatory Time
 
 23
 Roman contends that the trial court erred in calculating his back pay award. The court ruled that Roman was entitled to the overtime rate of $24 an hour for 120.75 hours of compensatory time. However, it credited Maietta for payment of $16 an hour for 105 of these hours. In effect, the trial court deducted any compensatory time payments already made by Maietta to Roman at the regular rate of pay from the total overtime pay he should have received for those held hours. The plaintiff argues that the trial court erred in allowing such a deduction.
 
 
 24
 As previously mentioned, the FLSA requires employers to compensate employees at a rate one and one-half times the regular rate of pay for any hours worked in excess of 40 hours per week. See 29 U.S.C. § 207(a). These payments must be made in "cash or its equivalent." 29 C.F.R. § 531.27. "Employers and employees may not, in general, make agreements to pay and receive less pay than the statute provides for. Such agreements are against public policy and unenforceable." See Rudolph v. Metropolitan Airports Comm'n, 103 F.3d 677, 680 (8th Cir.1996) (citing Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981)). Thus, we agree with the trial court that Roman is entitled to overtime pay for his compensatory time.
 
 
 25
 We reject Roman's challenge to the trial court's calculation of back pay. In resolving this issue, we find D'Camera v. District of Columbia, 722 F.Supp. 799 (D.D.C.1989), the case cited by appellee, persuasive. In D'Camera, the district court allowed the District of Columbia to deduct compensatory time used by the plaintiff police officers from an award of back pay. While the district court acknowledged that "[t]he FLSA does not expressly authorize such a deduction, nor does its legislative history offer any guidance," it found the District of Columbia's calculation to be "fair and permissible under the Act." Id. at 803. The district court held, and we concur, that "[p]laintiffs are entitled to be made whole, not to a windfall at the [defendant's] expense."
 
 
 26
 The language of the statute also suggests that we follow this course. Section 216(b) reads, "[a]ny employer who violates the provisions of sections 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their ... unpaid overtime compensation ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b) (emphasis added). Since Roman received partial payment for his overtime hours, Maietta remains responsible only for the unpaid portion. We find that the trial court's award of liquidated damages adequately compensated him for Maietta's violation of the FLSA. Cf. D'Camera, 722 F.Supp. at 804. Accordingly, we affirm the trial court's award of $2,436 plus costs and reasonable attorney's fees.
 
 III. CONCLUSION
 
 27
 For the foregoing reasons, we affirm the trial court's findings of fact and conclusions of law.
 
 
 28
 Costs to appellee.
 
 
 
 [1]
 Section 621(1) requires an employer to "pay weekly each employee engaged in its business the wages earned by the employee within 8 days of the date of that payment." 26 Me.Rev.Stat. Ann. § 621(1)